THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ERNIE E. BUSHMAN, Defendant-Appellant.

Fourth District   No. 4—85—0719

Opinion filed June 25, 1986.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MORTHLAND delivered the opinion of the court:

A Champaign County jury found the defendant guilty of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)), and the trial court sentenced him to 20 years' incarceration. We affirm.

The 24-year-old, mentally-retarded defendant was caring for 18-month-old Christopher Owen when the child stopped breathing. The defendant had lived with Christopher's mother, Christopher, and two other Owen children for approximately one year prior to the events of May 23, 1985.

On May 23, 1985, emergency medical personnel arrived at the Owen residence in Champaign to discover the defendant kneeling beside Christopher Owen. The child was not breathing and had no pulse. Efforts to revive Christopher, both at the scene and at a hospital, were unsuccessful.

Champaign police detective James Luecking first spoke with the defendant around 4:30 p.m., less than one hour after emergency medical personnel had first arrived on the scene. Luecking testified that the defendant told him Christopher had been in his high chair crying off and on for some time. The defendant said he changed the child's diaper and then placed Christopher in his crib. When the defendant returned an hour later, Christopher had rolled from his back onto his stomach and had shifted his position in the crib, but was apparently not breathing. The defendant told Luecking that Christopher was alive when placed in the crib.

Luecking then testified that he drove the defendant to the police station, informed him of his rights, and then resumed questioning. This time, the defendant said he had first taken the child from the high chair and put him on the floor. The defendant stated he shook his finger at Christopher and told him to "shut up" or be put in bed. When the child continued to cry, the defendant changed his diaper. The child did not quiet, the defendant told Luecking, so he put his hand over Christopher's mouth for two minutes. When he took his hand away from the child's mouth, the defendant had stated, Christopher was not crying, but was awake. The defendant placed Christopher in the crib on his back, with his head away from the defendant. When the defendant returned an hour later, he told Luecking the child was lying on his stomach with his head towards the near edge of the crib. However, Christopher was not breathing.

Following this statement, Detective Luecking testified, he drove the defendant home. During the trip, Luecking asked the defendant if he had told the truth. The defendant stated he had not and then explained that he did not know how long his hand had been over the child's mouth. In addition, the defendant stated he had placed Christopher on his stomach in the crib. The defendant did not know whether the child was breathing when he placed him in the crib.

Detective Luecking stated that he and the defendant then returned

to the police station. In response to Luecking's query as to whether the defendant had told the complete truth, the defendant replied that Christopher's foot had been limp before he put the child in bed. When asked if he thought he had killed Christopher, the defendant told Luecking he had not, but if he had it was accidental. Following these remarks, Luecking obtained a taped statement from the defendant, which was played for the jury at trial. This statement essentially combined the particulars of the previous four interviews.

The following morning, the defendant returned to the police station to learn the results of the autopsy on Christopher Owen. Utilizing a doll, the defendant demonstrated to Detective Luecking how he had covered the child's mouth. Luecking testified on redirect that when he asked the defendant what would happen if his hand were over Christopher's mouth too long, the defendant stated that Christopher would die.

Dr. Stan Bobowski, the pathologist who performed the autopsy on Christopher, also testified. He had concluded that Christopher Owen died from "acute asphyxia," caused by something suddenly cutting off his air supply. Dr. Bobowski testified that cutting off an 18-month-old child's air supply for more than 60 seconds would result in irreversible brain death. In most cases, resuscitation would not be possible. On cross-examination, Dr. Bobowski noted that, because of their underdeveloped palates, children of Christopher Owen's age could not properly breathe through the nose. Accordingly, covering the mouth alone would cut off the air supply. Dr. Bobowski noted no marks about Christopher's face, suggesting that only light to moderate pressure was applied. However, he believed that more than light pressure would be needed to cut off the air supply from a struggling infant. Heavy pressure, he opined, would definitely leave marks. The autopsy revealed that generally, Christopher Owen had been in good health and he bore no signs of abuse.

The defendant testified in his own defense. He asserted that when Detective Luecking asked him what would happen if the child's air supply were cut off, Luecking spoke only in terms of whether Christopher's nose and mouth were covered. The defendant said he did not know that merely covering Christopher's mouth could cut off the child's air supply. He denied ever covering the child's nose.

After hearing the evidence, the jury received instructions defining murder and involuntary manslaughter. The court rejected defense instruction number three, which set forth the elements of murder and also directed jurors that the State must negate all elements of involuntary manslaughter beyond a reasonable doubt in order to prove mur-

der. The jury returned a verdict finding the defendant guilty of murder and the court subsequently sentenced him to 20 years' imprisonment.

On appeal, the defendant urges that the State did not prove him guilty of murder beyond a reasonable doubt. Alternatively, he suggests that the evidence supports conviction only for involuntary manslaughter. The defendant also urges this court to extend its holding in *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380, to require the jury to be instructed that the State must negate all elements of involuntary manslaughter before convicting a defendant of murder.

The defendant was indicted for murder pursuant to section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)). That section provides:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
*  *  *

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another."

Thus, the State was required to prove beyond a reasonable doubt that the defendant was aware that covering Christopher's Owen's mouth created a strong probability of death or great bodily harm. See *People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 408 N.E.2d 1098.

■ The evidence regarding the defendant's knowledge is conflicting. He testified in his own behalf that he did not realize Christopher would not be able to breathe through his nose. On the other hand, Detective Luecking testified on redirect that when he asked the defendant what would result from holding his hand over Christopher's mouth too long, the defendant responded that Christopher would die. Unquestionably, the evidence was close. However, it is the jury's function to assess the credibility of witnesses and determine the inferences to be drawn from their testimony. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) Where the evidence is merely conflicting, this court will not substitute its judgment for that of the jury. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) In the present case, the State presented evidence which, if believed, leads to the inference that defendant knew his actions were likely to produce Christopher's death. Accordingly, we will not overturn the defendant's conviction for murder. Likewise, we will not reduce his conviction to involuntary manslaughter.

■ We next turn to the defendant's contention that the trial court erred in refusing an instruction which outlined the elements of murder and would have instructed the jury that the State must disprove all elements of involuntary manslaughter in order to convict of murder.

In *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380, this court noted that voluntary manslaughter involves the same intent as murder. However, voluntary manslaughter occurs when one of two mitigating elements is present: passion, or an unreasonable belief that force was necessary. In effect, these elements make the intent less culpable than that required for murder. The *Bolden* court found that the mitigating elements in voluntary manslaughter work as a partial affirmative defense. Accordingly, in order to convict a defendant of murder, a jury must find that the two elements which would make the defendant less culpable do not exist beyond a reasonable doubt.

By contrast, involuntary manslaughter occurs when a killing is unintentional, but results from reckless acts by the defendant. (*People v. Hoffer* (1985), 106 Ill. 2d 186, 478 N.E.2d 335.) Unlike voluntary manslaughter, which reduces punishment for an intentional homicide by adducing a less culpable state of mind, involuntary manslaughter exists in the complete absence of the state of mind required for murder. (*People v. Bauman* (1975), 34 Ill. App. 3d 582, 340 N.E.2d 178.) Involuntary manslaughter, unlike voluntary manslaughter, involves fewer rather than more issues than murder. When the State proves that a killing was intentional or knowing, involuntary manslaughter is no longer possible.

Proving murder where the circumstances might also suggest voluntary manslaughter requires the State to negate certain elements, as well as show the requisite intent or knowledge. This is not the case where involuntary manslaughter is the only alternative to murder. Thus, the concerns this court addressed in *Bolden* do not exist if involuntary manslaughter and murder are the only alternatives facing the jury. Instructing the jury to determine whether the State has negated the existence of "recklessness" can only create confusion because a finding that a killing was intentional or knowing, as is required to convict of murder, *ipso facto* eliminates the possibility that the acts causing death were merely reckless. We conclude that the circuit court properly rejected the defendant's proposed instruction number three.

For the foregoing reasons, we conclude the defendant was properly convicted of murder. Accordingly, we affirm the judgment of the circuit court.

Affirmed.

McCULLOUGH, P.J., and GREEN, J., concur.